(Docket Entry Nos. 269, 270, & 297)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

NANCY PERLMAN,

        Plaintiff,

        v.                             Civil No. 01-0651 (RBK)

VIRTUA HEALTH, INC. et al.,

        Defendants.

## O P I N I O N

**KUGLER**, United States District Judge:

        Presently before the Court in this personal injury diversity suit by Nancy Perlman are two motions for summary judgment filed by Sparta Surgical Corporation ("Sparta Surgical") and Sparta Olsen Electrosurgical, Inc. and one motion for summary judgment filed by Sparta Surgical, individually. Because the motions center on the same core facts, the Court will address all three motions in this one Opinion. To avoid confusion, the Court, when discussing Sparta Olsen and Sparta Surgical together, will refer to the two companies as "the Sparta Group." Otherwise, the Court will refer to the companies individually as Sparta Olsen and Sparta Surgical, as appropriate. In sum, the Court will deny each motion for summary judgment.

## I. INTRODUCTION

Recognizing that many of the following facts are in dispute, the Court nonetheless understands the case as follows.  Perlman injured her hand while performing surgery on a patient at Virtua Memorial Hospital Burlington County ("Virtua").  Specifically, the electrosurgical device she was using somehow malfunctioned and electrocuted and burned Perlman's hand.  Though she completed the surgery with other equipment, the condition of her hand grew progressively worse and it became apparent that she would suffer permanent injury.  One possible cause of the malfunction is that the insulation on the cord attached to the surgical device itself–the 6-B Olsen cord, manufactured by Olsen Electrosurgical, which later became Sparta Olsen–was so deteriorated that it left Perlman exposed to a live current of electricity.  Hence, Perlman has brought product liability claims against Sparta Olsen and its parent, Sparta Surgical.

The motions by Sparta Surgical and Sparta Olsen pertain mostly to the warnings, if any, that accompanied the 6-B cord.  The Sparta Group claims it included two warnings with the 6-B cord.  In support, the Sparta Group points to the testimony of Susan Dubois, who worked at Olsen and then Sparta Olsen.  Dubois deposed that she included two warnings with every 6-B cord that she packaged.  One warning read as follows:

> WARNING--FOR PATIENT SAFETY & SURGEON SAFETY
>
> TAKE ALL PROPER PRECAUTIONS AS ELECTROSURGERY MAY BE DANGEROUS

--Inspect all electrosurgical instruments and accessories prior to their use in order to assure the integrity of the insulation.  Double-checking each device can prevent avoidable patient/surgeon "burns".
--Inspect any plugs and wire connections for <u>any</u> cuts, breaks, shorts or loose wires.
--Do not use a device if you observe <u>any</u> chips, cuts or holes in the insulation material
--Avoid unnecessary or prolonged activation. Activate <u>only</u> when touching or immediately next to the point of contact.
--Protect against avoidable injury by establishing a protocol for device examination and maintenance.

DO NOT USE A DAMAGED INSTRUMENT OR CABLE!

The other warning testified to by Dubois was in the form of a rectangular package label that read "OEI. Olsen Electrosurgical Inc.. Reusable/Non-Sterile/Autoclaveable.  Up to 20 Uses.  6-B."  Contrary to the testimony of Dubois are the testimonies of Glee Baker and Donna Forrest.  Both were employees of Virtua at the time of Perlman's injury and both had responsibilities for ordering and tracking surgical equipment such as the 6-B cord.  Baker, who received the 6-B cord in its bag but out of the shipping box, deposed that the label on the bag itself did not have any care or sterilization information on it.  Baker further deposed that there were not any inserts with the 6-B cord when she received the bag.  Forrest, who generally received the 6-B cord in her department before sending it on to Baker, testified that although Virtua followed the sterilization procedures suggested by Sparta Olsen or Olsen, she never saw the warnings Sparta claims were included and never saw any information regarding the maximum number of uses for each cord**.**  Forrest was not with Virtua at the time the 6-B cord that

malfunctioned was delivered to Virtua.  Rather, Forrest started for Virtua in the year 2000 and was familiar with the care necessary for the operating equipment that Virtua ordered.

When presented with a warning at her deposition that referred to a minimum number of uses for the 6-B cord, Forrest explained that had she seen such a warning she would have tracked the use of the cord and also would have called Olsen to get clarification.  Specifically, Forrest explained that a maximum, not a minimum, is the most important number and that she would need clarification of such a warning so that she could understand how to safely track the cord.[1]  Forrest did testify, however, that she was aware of the importance of inspecting and sterilizing cables such as the 6-B cord.

Regarding actual failure of the 6-B cord, Sparta Olsen was aware of at least one occurrence.  In particular, an FDA, "Adverse Event Report" described an incident that occurred about November 4, 1999 as follows: "Insulation on the cautery cord split and the drape on the left side of the [patient] caught on fire.  Assist surgeon patted down flames.  Water was also poured on site.  Doctor burned both hands."  There is no evidence that Sparta Olsen changed its warnings or product instructions after this report.  The only other documented incident of cord failure is, of course, the one at issue in this case.

---

[1]  Neither of the product inserts discussed by Sparta relates to a minimum number of uses for the 6-B cord.  Presumably, Forrest was referring to a passage from an Olsen catalog that read as follows: "Olsen reusable devices and accessories withstand a minimum of 20 autoclave cycles when sterilized according to the procedures below.  Most reusable devices and accessories will surpass this standard if you establish a protocol for proper care and inspection."  For whatever reason, the parties have not included a copy of this catalog in the record.  The Court is aware of this warning only from reading the expert report of B.H. Barkilow.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In deciding whether there is a disputed issue of material fact, a court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party.  Id. at 250; Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of persuasion at trial, however, "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  The non-moving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material of fact.  FED. R. CIV. P. 56(e); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (citation omitted).  "A

5

party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment."  Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 322).

## III.  DISCUSSION

The Court will deny each of the three motions for summary judgment filed by Sparta Surgical and Sparta Olsen.  The Court's reasoning will be set forth as follows. First, the Court will discuss the Sparta Group's argument that its warnings were adequate as a matter of law.  Simply put, such issues are normally for the trier of fact to decide and this case does not prevent an opportunity for exception.  Second, the Court will address the arguments the Sparta Group has put forward in support of its position that any failure to warn on its part was not the proximate cause of Perlman's injury.  The overarching reason for the Court's rejecting them is that whether a particular act, omission, or circumstance was the proximate cause of an injury is a question for the jury. Additionally, the arguments set forth by the Sparta Group are unsupported by New Jersey law.

Third, the Court will discuss the Sparta Group's two arguments that it had no duty to warn of the dangers associated with the 6-B cord.  The Court is not persuaded by either of Sparta Group's arguments on this point.  Fourth, the Court will discuss the

Sparta Group's contention that the record cannot support an award of punitive damages. Whether punitive damages are appropriate is typically a jury question and a jury could find, based on the present record, that punitive damages are appropriate.  Finally, the Court will dispense with two related arguments from Sparta Surgical: (1) that it is not liable for the acts of its subsidiary, Sparta Olsen, and is thus entitled to summary judgment on all claims against it, and (2) that the Complaint does not allege a product liability claim against it.  Sparta Surgical has failed to meet its initial burden on summary judgment with respect to the first argument and the allegations set forth in the Complaint clearly allege product liability claims against Sparta Surgical.

As it pertains to the current motions, Perlman's case against the Sparta Group is that it failed to adequately warn of the dangers associated with the 6-B cord. Perlman's product claims are brought pursuant to New Jersey's Product Liability Act, N.J. Stat. Ann. § 2A:58C-2 ("PLA").  Her burden of proof is not significantly different than any other tort plaintiff.  The PLA imposes liability on a manufacturer or a seller for failing to provide adequate warning or instructions with a product that caused a plaintiff's harm.  Id.. A failure to provide adequate warnings is often likened to a defect in a product's design.  See Butler v. PPG Indus., Inc., 493 A.2d 619, 621 n.2 (N.J. Super. App. Div. 1985) (citing Feldman v. Lederle Labs., 479 A.2d 374, 385 (N.J. 1984)).  To prevail on a claim for failing to adequately warn, a plaintiff must establish that (1) the product did not contain an adequate warning; (2) the inadequacy in the warning existed

when the product left the defendant's control; (3) the inadequate warning caused injury to

the plaintiff; and (4) the plaintiff was a reasonably foreseeable user of the product.  Cf.

Zaza v. Marquess & Nell, Inc., 675 A.2d 620, 629 (N.J. 1996).


A.  Adequacy of the Warnings with the 6-B Cord

The Sparta Group argues that it is entitled to summary judgment on

Perlman's failure to warn claim because the warnings accompanying the 6-B cord were

adequate as a matter of law.  The Court rejects this argument because it is disputed

whether there was a warning that reached Virtua in the first place and whether the

warning was adequate.  The standard by which the adequacy of a warning is to be

assessed is governed by the PLA as follows:

> An adequate product warning or instruction is one that a *reasonably prudent*
> *person in the same or similar circumstances* would have provided with respect
> to the danger and that communicates adequate information on the dangers and
> safe use of the product, taking into account the characteristics of, and the
> ordinary knowledge common to, the persons by whom the product is intended
> to be used . . . .

N.J. STAT. ANN. 2A:58C-4 (emphasis added).

The Court adds emphasis on the "reasonably prudent person" language to

impress upon the reader that this standard, by its nature, presents a jury question.  Adding

to that, New Jersey courts agree that the adequacy of a product warning is a jury question.

See Levy v. Yamaha Motor Corp., 825 A.2d 554, 558 (N.J. Super. App. Div. 2003)

("'Questions of reasonableness in determining the adequacy of warnings are ordinarily for

8

the jury to resolve.'") (quoting Grier v. Cochran Western Corp., 705 A.2d 1262, 1266

(N.J. Super. App. Div. 1998)).

      The Court need not be held up by the Sparta Group's argument. In this case,

it is disputed whether the warnings ever reached Virtua employees–permitting one to

question if they were appropriately placed with the product in the first place–and the two

warnings the Sparta Group claims were included with the products are vague and cannot

be adjudged adequate as a matter of law.  Specifically, the Court is referring to the

deposition testimonies of Baker and Forrest in which each testified to never having seen

the warnings.  Though the testimony of Dubois is probative of whether Virtua received

warnings with the 6-B cord, the testimonies of Baker and Forrest create a genuine issue of

material fact.

      Moreover, notwithstanding the testimonies of Baker and Forrest, reasonable

jurors could differ on whether the language of the warnings sufficiently warned of the

risk posed by the 6-B cord under the circumstances.  Particularly debatable is whether the

longer of the two warnings, which instructs the reader to inspect the equipment, double-

check devices, check for damage to the insulation, etc., is consistent with the declarative

statement on the label "up to 20 uses."  A manufacturer can render an otherwise adequate

warning inadequate by presenting the user with an additional, inconsistent warning.  See

Levey, 825 A.2d at 558 ("As recognized by a leading products liability treatise, what

might otherwise be an adequate warning can be undermined and made ineffective by

counteracting representations.") (citation and quotation marks omitted).  Thus, a jury could find that the two warnings Sparta claims it included with the 6-B cord contradicted each other so that neither warning was particularly helpful.   Ultimately, it will be for the jury to decide (1) whether the product warnings reached Virtua in the first place and (2) whether the language of the warnings was adequate in light of the risk and the possibility of one warning contradicting the other.[2]

B.  Proximate Cause

Regarding causation, Sparta argues that, even assuming its warnings were inadequate, its warnings were not the proximate cause of Perlman's injury.  Sparta claims that, with regard to Perlman's burden of proving that the allegedly inadequate warning was a proximate cause of her injury, "defendant's are aided by the heeding presumption."  In support, Sparta cites Sharpe v. Bestop, 713 A.2d 1079 (N.J. Super. App. Div. 1998).  As explained by the Sharpe court, the heeding presumption was adopted for the express purpose of making a plaintiff's burden less onerous on the issue of proximate cause with respect to a product warning.  Id. at 1084 (describing the presumption as one that would "lighten the plaintiff's burden of proof on the proximate cause issue.").  Specifically, in a

_____

[2]  Even if the warnings do not contradict each other, the jury must decide if they meet the standard set forth by N.J. STAT. ANN. § 2A:58C-4.  The Court wishes to note that it will not address the Sparta Group's argument that Perlman's expert witness, Dr. Barkalow, provides only a "net opinion" on the issue of the adequacy of the warnings.  His testimony was not necessary for the resolution of this motion, so the Court will not decide in this Opinion whether his opinion will be admissible at trial.

product liability case based on a failure to warn, the heeding presumption permits the plaintiff "the use of the presumption that he or she would have followed an adequate warning had one been provided . . . ."  Id.  To rebut this presumption, the defendant "must produce evidence that such a warning would not have been heeded."  Id. (citations and quotation marks omitted).  And the only benefit a defendant derives from rebutting this presumption is avoiding a directed verdict.  Id.

There is the possibility that, in a given case, the rebuttal evidence is so strong and one-sided that no reasonable person could find that the absence or inadequacy of a warning was the proximate cause of the plaintiff's injury.  See N.J. R. EVID. 301;[3] Calderon v. Machinenfabriek Bollegraaf Appingedam BV, 667 A.2d 1111, 1116 (N.J. Super. App. Div. 1995) (holding that defendant's evidence so overwhelmingly rebutted the heeding presumption and explaining that under New Jersey Rule of Evidence 301 when a party rebuts a presumption, the issue is normally left for the jury; but that 301 "recognizes that there are exceptional cases. Where 'reasonable persons would not differ as to the existence of the presumed fact,' the issue need not be presented to the jury.").  In Calderon, there was undisputed evidence that the employer who maintained the machine that caused the injury regularly and openly disregarded safety instructions provided with the product.  The evidence also established that the employer systematically removed

---

[3]  N.J. R. EVID. 301 applies to this case pursuant to FED. R. EVID. 302 ("In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law.").

safety grates and encouraged employees to use the machine in an obviously dangerous

manner.  The employer's blatant disregard for safety instructions was such that the

Cadleron Court penned, "[w]e do not believe that a reasonable jury in this case could

have determined that even a certified letter from [the manufacturer] explaining that the

grates should be reinstalled would have been followed by [the employer]."  Calderon, 667

A.2d at 1116.

      The evidence in this case is not so compelling.  Virtua employees Baker and

Forrest never saw the warnings that are in the record.  Forrest deposed that had she seen

the warnings she would have done something different, such as establishing a tracking

system.  Specifically, at her deposition she was asked "if you had been provided with

information about the expected lifetime of that cord, is it your testimony that Virtua

Memorial would have put a procedure in place to identify the cords and track their uses

and sterilizations?"  Forrest responded, "Absolutely."  At the very least, this presents a

jury the opportunity to conclude that Virtua would have, in response to an adequate

warning, done something different in its care of the 6-B cord.  In that way, the present

record differs greatly from that in Calderon.  Leaving prior cases aside, it is enough to

state that the record in this case would permit reasonable people to disagree over the

proximate cause of Perlman's injury.

      The Sparta Group's next argument in support of its motion is that the

Virtua's negligent inspection and sterilization of the 6-B cord was the supervening cause

of Perlman's injury.  The Court rejects this argument.  There need not be only one

proximate cause of a plaintiff's injury.  To the contrary, when there is more than one act

that may have contributed to the complained of harm, proximate cause encompasses the

"notion of concurrent cause."  Brown v. United States Stove, 484 A.2d 1234, 1242 (N.J.

1984).  In a product liability action, if the original defect "although not the sole cause of

the accident, constitutes a contributing or concurrent proximate cause in conjunction with

the subsequent conduct of the purchaser, the manufacturer remains liable."  Butler v. PPG

Indus., 493 A.2d 619, 622 (N.J. Super. App. Div. 1985) (citing Brown, 484 A.2d at 1234.

To avoid liability, the manufacturer must prove that another cause was the sole cause; but

the manufacturer cannot prevail by attempting to prove that the purchaser "failed to take

reasonable steps to protect against the defect created by the manufacturer."  Butler, 493

A.2d at 622 (citations omitted).  The critical inquiry in this regard is "whether the

manufacturing shortcoming, be it in design or fabrication, endured and remained

operative during the course of another's subsequent misconduct."  Brown, 484 A.2d at

1243.

       This attempt to shift responsibility for Perlman's injury fails for the obvious

reason that the allegedly defective nature of the 6-B cord may have endured and remained

operative during the period the Sparta Group claims Virtua employees were negligent.

The Sparta Group claims, and it may well be true, that Virtua employees were negligent

in inspecting and caring for the 6-B cord.  The risk posed by the 6-B cord had not abated,

however, when the Virtua employees failed to inspect the cord.  Included in the concept

of a design defect is the failure to warn of risks associated with using a product.  As

already addressed by the Court, it is disputed whether Virtua employees were adequately

warned about the need to inspect the 6-B cord in the first place.  Thus, even if no jury

could find that Virtua employees were not negligent, a jury would still need to consider

whether the product was defective at the time of the Virtua employees' negligence.


    C. <u>The Sparta Group's Duty to Warn</u>

    The Sparta Group contends it did not have a duty to warn of the dangers

associated with the 6-B cord.  In support, it offers two arguments–both of which the Court

rejects. First, the Sparta Group argues that it owed no duty to Perlman to warn of any

dangers associated with the 6-B cord because the Sparta Group is, in this case, merely a

component manufacturer.  The larger product, the Sparta Group claims, was the

electrosurgical device as a whole, which included the 6-B Cord as a power supply.  In

support, the Sparta Group cites <u>Zaza v. Marquess & Nell, Inc.</u>, 675 A.2d 620, 629 (N.J.

1996).  The Sparta Group has misinterpreted the <u>Zaza</u> case.  The <u>Zaza</u> court explained the

theory on which the Sparta Group is seeking to rely as follows: "The prevailing view is

that a manufacturer of a component part, not dangerous in and of itself, does not have a

duty to warn an employee of the immediate purchaser of the component where the

immediate purchaser is aware of the need to attach safety devices."  <u>Id.</u> at 633.  The

14

policy behind this rule is that the manufacturer of a component part that is not itself dangerous should not be held liable for the shortcomings of the larger, defective product. See id. at 634-35. Viewed this way, the rule avoids a sort of guilt by association theory of product liability by not holding a manufacturer of a safe component liable simply because the ultimate product was defective.

A component manufacturer's duty to warn arises when it is foreseeable that its product will be incorporated into the finished product in such a way that will cause injury. Id. at 633-35. Requiring that the need to warn be foreseeable protects the component manufacturer from having to ensure that the finished product incorporates the component in a way that is mechanically sound. Id. at 633-34. Otherwise, manufacturers who produced components exactly according to specifications would nonetheless need to "investigate whether the use of its non-defective product would be made dangerous by the integration of that product into the complex system designed and installed by experts." Id. at 634. Under such a scenario, "[c]omponent fabricators would become insurers for the mistakes and failures of the owners and installers to follow their own plans." Id.

In attempting to cast itself as the innocent component manufacturer under this rule, the Sparta Group contends that it is entitled to summary judgment because "[i]t was not reasonably foreseeable that the cable would fail prior to there being some observable damage that an inspection would reveal." And further, "[t]he cord itself is not dangerous. It only becomes potentially dangerous when it is integrated into an

15

electrosurgical system and electricity is running through it." The first argument misses the point of the component manufacturer rule discussed in <u>Zaza</u>. In particular, the foreseeability component that exists in this rule is geared toward the component manufacturer's inability to foretell how its component will ultimately be incorporated into the finished product. The type of foreseeability to which the Sparta Group refers is, however, of a different type. The Sparta Group's argument relates to the foreseeability of the end-user's use or misuse of its product. Obviously, such an argument is unrelated to the rule and underlying policies set forth in <u>Zaza</u>.

The Sparta Group's other argument–that the 6-B cord was dangerous only when connected to the surgical device and when electricity was running through it–is beyond comprehension. In lieu of expounding on the inherent illogic in this argument, the Court simply states that the rule from <u>Zapa</u> does not operate in the manner the Sparta Group suggests. Specifically, it does not protect the manufacturer of a cord that may have failed while the cord was being used in the exact manner contemplated by the manufacturer. In other words, the Sparta Group knew its cords would be plugged into surgical devices with electricity running through the cords to the device. That is the intended use for any cord. If injury could result from using the cord as intended–as it allegedly did here–the Sparta Group had a duty to warn of that danger.

The Sparta Group's second argument regarding its duty to warn is that it had no duty to warn Virtua employees because Virtua, as a "sophisticated purchaser," was

responsible for maintaining its products and warning its own employees.  Specifically, the

Sparta Group states in its brief "[i]n New Jersey, the Superior Court Appellate Division

has held that the sophisticated purchaser defense is available to defendants in product

liability actions."  In support it cites only Olnecki v. Mead Chemical Co., 507 A.2d 803

(N.J. Super. Law Div. 1986), but the Sparta Group's citation identifies the case as one

from the appellate division.  In any event, that opinion squarely rejected the proposition

for which The Sparta Group cites it:

> Defendants argue that evidence of RCA's alleged negligence is admissible as
> to the allegations of negligence. Defendants contend that they were absolved
> of the duty to warn because RCA was a "sophisticated purchaser." They also
> claim that RCA's failure to warn its employees was the superseding cause of
> plaintiff's injuries.

> There is an important difference between these negligence counts and the strict
> liability counts. Constructive knowledge of the dangers to foreseeable users is
> imputed to a defendant in a strict liability action. There is no need to prove that
> the manufacturer knew or should have known of any dangerous propensity of
> its product in a strict liability action . . . . *Furthermore, knowledge of the risk*
> *that employers may not adequately warn their employees is imputed to the*
> *defendants in a strict liability action . . . . Thus, in a strict liability action*
> *against a manufacturer, the manufacturer cannot be absolved of the duty to*
> *warn.* However, under negligence law, knowledge of the risk that an employer
> will not warn its employees is not imputed to a manufacturer. Instead, the
> scope of the duty to warn is governed by § 388 of the Restatement, Torts 2d
> (1965). Under § 388, plaintiff must show defendant negligently ignored or
> failed to discover the risk that the employer would not warn its employees.
> Whether the manufacturer's failure to warn constituted negligence would
> depend on the employer's knowledge and, consequently, the reasonableness of
> the manufacturer's expectation that the employer would warn its employees.
> Thus, the "sophisticated user" defense has been held available under § 388. .
> . . This court is persuaded by the reasoning of Judge Ackerman in *Menna* and
> finds that the "sophisticated user" defense is available to defendants here as to
> plaintiff's negligence claims under New Jersey law. Accordingly, defendants

17

may offer evidence concerning RCA's alleged negligence in defense of plaintiff's causes of action in negligence.

Id. at 806-07.

Perlman's product liability claims are brought under the PLA and are thus rooted in the theory of strict liability, not negligence.  For that reason, the Court rejects the Sparta Group's attempt to escape liability by raising this so-called sophisticated purchaser defense.  Sparta's argument on this point has no basis in New Jersey law.[4]

D.  <u>Punitive Damages</u>

The Sparta Group argues that it is entitled to summary judgment on Perlman's claim for punitive damages because there is no evidence that it acted in a wanton and willful manner toward Perlman or that its conduct otherwise rose to the level of an "evil-minded act."  Under New Jersey law, punitive damages are appropriate

only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J. STAT. ANN. § 2A:15-5.12(a).

Further, the New Jersey Legislature has placed the decision whether to award

---

[4]  The Court is troubled by defense counsel's lax citation to New Jersey law and its failure to apprise the Court of the true holding of the case to which it cites.  In anticipation of a trial and the attendant pre-trial process that will necessarily include further submissions to the Court, the Court wishes to remind counsel of the duties imposed by FEDERAL RULE OF CIVIL PROCEDURE 11.  In the future, perceived transgressions of this rule will be met by an Order to Show Cause pursuant to Rule 11(c)(1)(B).

punitive damages with the trier of fact:

> b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
>
> > (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
> >
> > (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
> >
> > (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
> >
> > (4) The duration of the conduct or any concealment of it by the defendant.

N.J. STAT. ANN. § 2A:15-5.12(b).

Though summary judgment provides the Court an opportunity to review the evidence and possibly decide as a matter of law that a defendant shall not be subject to an award of punitive damages, doing so in this case would require an improper balancing of the evidence.  This is because there is some evidence that the Sparta Group was aware of a potential for cord failure under certain circumstances.  Specifically, there is the "Adverse Event Report" that describes the incident in which the insulation on the 6-B cord failed and burned a doctor.  This is relevant to the first two factors enumerated in section 2A:15-5.12(b) in that it shows there was a real possibility that the 6-B cord insulation could fail and it shows that the Sparta Group was aware of this possibility. There is also evidence that the Sparta Group issued with its products certain warnings regarding inspection and cord failure, but that those warnings never changed after the

19

Adverse Event Report.  Thus, there is evidence of knowledge and evidence of the Sparta

Group's response.  The New Jersey Legislature clearly contemplated such a situation and,

in section 2A:15-5.12(b), directed the trier of fact to assess (1) the risk of serious harm;

(2) the defendant's awareness of the risk; (3) the defendant's response; and (4) the

duration of the conduct or any concealment of the conduct.

The state of the record, as it pertains to punitive damages, is such that a jury

could find that the Sparta Group knew of the potential for the 6-B cord insulation to fail

and cause injury.  Next, the jury could find essentially one of five things: (1) based on the

testimony of Baker and Forrest, that the Sparta Group did not actually include a warning

with the 6-B cord; (2) that the Sparta Group did include a warning and that the warning

was an appropriate response relative to its knowledge of the risk associated with using the

6-B cord; (3) that the "up to 20 uses" warning, by failing to elaborate on its admonition

and by failing to disclose the risk of insulation failure and therefore burning or

electrocution, was wholly inadequate in light of the fact that the Sparta Group knew of the

risk in 1999 and failed to change its warning; (4) that although the warnings were

adequate as stated, they were not placed on or with the product in an appropriate manner

in light of the risk of insulation failure, which is a very serious risk; or (5) although the

product warnings were adequate in themselves, they provided dangerously conflicting

information when read together in that the one warned to inspect but did not place any

limit on number of uses while the other stated only a maximum number of uses, without

20

elaborating.  Scenarios one, three, four, and five could support a jury's awarding punitive damages because a jury could find that a failure to properly warn or change a warning in light of the very serious risk of electrocution and burning constitutes a wanton and willful disregard for the safety of the end-user of the cord.

E.  Liability of Parent Corporation

Sparta Surgical moves separately for summary judgment on all Perlman's product liability claims in general, and on Perlman's claim for punitive damages in specific, arguing that, as Sparta Olsen's parent corporation, it is not liable for the acts of Sparta Olsen.  In support, Sparta Surgical cites the United States Supreme Court case United States v. Bestfoods, 524 U.S. 51, 61 (1998).  Specifically, Sparta Surgical sets forth the following statement of law from the Bestfoods opinion: "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  Id. at 61.  Sparta does not cite, however, the following lead sentence in the next paragraph of the Bestfoods opinion:

> But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

Id. at 62.

Because Sparta Surgical does not address this exception to the general rule, let alone the controlling New Jersey authority on the issue, the Court will not proceed to

21

address its argument.  Simply put, Sparta Surgical has failed to meet its burden on summary judgment because it has failed to demonstrate how there is no issue of fact as to its liability for Sparta Olsen's acts.  Sparta's burden, as the moving party, cannot be met by mere citation to a general statement of law.  This is especially so where, as here, the pleadings allege a situation where piercing the corporate veil and thus ignoring the parent-subsidiary relationship would be appropriate.  Specifically, in paragraph 13 of the Ninth Amended Complaint, Perlman alleges "Olsen and Sparta Olsen were the alter egos and mere instruments of defendants Sparta Surgical and [CEO Thomas Reiner], which so dominated them that they had no separate existence in fact."  Normally, pleadings alone are not enough to survive summary judgment; but the above pleadings have not been adequately challenged by Sparta Surgical.  Therefore, Perlman will be left to her proofs on the allegations in paragraph 13.

In a somewhat related argument, Sparta Surgical contends that it is entitled to summary judgment for any product-related claims because the Complaint does not identify it as a "Selling Defendant."  As stated, however, the Ninth Amended Complaint alleges that Sparta Surgical and its CEO Reiner so dominated Olsen and Sparta Olsen that they had no separate existence.  In paragraph 48, under Count I of the Ninth Amended Complaint, Perlman describes the "Selling Defendants" as "the designers, manufacturers, sellers, distributors, marketers, promoters and/or suppliers of the Electrosurgical Generator and/or a related accessory, hook, cord, cable, outlet, or other component or part

used in conjunction with the device." Because Sparta Olsen and Olsen clearly fit this description and because Perlman alleges that Sparta Surgical so dominated Olsen and Sparta Olsen that they had no separate existence in fact, the Complaint includes Sparta Surgical as a "Selling Defendant."[5]

## IV. CONCLUSION

For the reasons stated in the body of the Opinion above, the Court will deny the motions for summary judgment filed by the Sparta Group and will deny the motion for summary judgment filed by Sparta Surgical independently.

s/Robert B. Kugler

Dated: 5-3-05                    ROBERT B. KUGLER
                                 United States District Judge

---

[5] As the Court has explained in a recent Opinion in this case, when a party moves for summary judgment by attacking only the pleadings, as Sparta Surgical has on this point, the Court will treat the motion as one under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. See 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 (3d ed. 1998) ("Because the summary-judgment motion is designed to pierce the formal allegations of the pleadings, it normally is not made or opposed on the basis of the pleadings alone. Moreover, if the motion is made solely on the basis of one or more pleading, it is equivalent to a motion under Rule 12(b) (6) for a dismissal for failing to state a claim for relief or under Rule 12(c) for a judgment on the pleadings and should be treated as such.") (citing cases). Therefore, "the motion should not be granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." Mele v. Fed. Reserve Bank of New York, 359 F.3d 251, 253 (3d Cir. 2004) (citation and quotation marks omitted). In that way, deciding a motion for judgment on the pleadings under Rule 12(c) is no different than deciding a motion to dismiss under Rule 12(b)(6). Id.