(Docket Entry Nos. 295, 296, & 309)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

NANCY PERLMAN,

        Plaintiff,

    v.                                  Civil No. 01-0651 (RBK)

VIRTUA HEALTH, INC., et al.,

        Defendants.

# **O P I N I O N**

**KUGLER**, United States District Judge:

        This matter is before the Court in this diversity suit on a motion for summary judgment by Defendants Virtua Health Inc., Virtua Memorial, Burlington County, Donna Forrest, and Glee Baker. The single argument presented by Defendants is that Plaintiff Nancy Perlman was a special employee of Virtua Memorial for purposes of Workmen's Compensation and thus cannot recover in tort from any of the Defendants. Because issues of fact remain whether Perlman was a special employee of Virtua, the Court will deny Defendants' motion.

## I.  FACTUAL BACKGROUND

        Plaintiff Nancy Perlman severely injured her hand while performing surgery

with an electrosurgical device during her rotation as a surgical resident at Virtua Memorial. In short, the surgical device electrocuted and burned her hand, causing Perlman to lose significant use of the injured hand. One of the many aspects of Perlman's lawsuit is her claim of negligence against Virtua Memorial and its staff, including Defendants Baker and Forrest. At issue in this motion is whether Perlman is an employee of Virtua Memorial for purposes of the New Jersey Workmen's Compensation Act, N.J. STAT. ANN. § 34:15-1. Hence, the Court will discuss the record as it pertains to the details of Perlman's residency at Virtua. In particular, the Court's attention will be on the basic indicia of an employer-employee relationship: (1) the existence of a contract; (2) the type of work being performed; (3) who controls the work being performed; (4) who pays the putative employee's wages; and (5) who has the power to hire and fire the putative employee.

Foremost, Perlman was a surgical resident employed by the Cooper Health System ("Cooper"). At the time of her injury, Perlman was participating in a two-month surgical rotation at Virtua Memorial in fulfillment of the requirements of Cooper's residency program. The terms of Perlman's rotation at Virtua Memorial were governed, for the most part, by a General Surgery Residency Affiliation Agreement between Virtua Memorial and Cooper. The Agreement lists the promises of Cooper and Virtua Memorial in terms of "Obligations." The relevant obligations of Virtua Memorial (referred to in the Agreement simply as Memorial) are listed in the Agreement as follows:

>1.1 Memorial shall contribute to the educational objectives of the general surgery residency program (the "Program") sponsored by Cooper.
>
>1.2 The teaching staff responsible for providing the educational program and supervising the residents at Memorial shall be designated by Memorial. Memorial will provide a teaching staff of appropriate qualifications and credentials and shall maintain an appropriate faculty-resident ratio. Memorial will appoint one member of the teaching staff to be responsible for the overall coordination of resident activities.
>
>1.3 Residents shall be under the direction, supervision and control of Memorial with respect to their relationship with Memorial patients and employees. Residents shall be considered the agents of Memorial in carrying out patient care responsibilities.
>
>Cooper shall inform all residents assigned to Memorial of the nature of the relationship between them and Memorial, as described in this section.
>
>\* \* \* \*
>
>1.9 Memorial shall reimburse Cooper quarterly for the fees associated with the cooperative training of residents in the program as identified in Attachment B. A revised schedule of fees will be submitted annually, by Cooper, on or before April 1 for the upcoming academic year. Cooper agrees not to list the rotating resident on their Medicare Cost Report during this period.

Grand Cert. at Exhibit D.

Attachment B, which is referenced in section 1.9 of the Agreement, lists "Financial Responsibilities" for the period between July 1, 1997 and June 30, 1998. Specifically, the document lists $117,024 as "Salary for 3 FTE's (PGY-3)." Next it lists "Benefits 25%," attributing $29, 256 to this item. Finally, Attachment B lists "Administrative Fee 15%" and attributes $17,553 to this item. The Court is without information as to the significance of the terms FTE and PGY-3. Presumably, PGY-3

refers to a third-year resident. But given that Perlman was a second-year resident at the time of her injury–and assuming PGY-3 does in fact refer to a year third-year resident–the relevance of Attachment B is doubtful. Ultimately, Perlman's paycheck, in the form of a direct deposit into her bank account, came from Cooper.

The relevant obligations of Cooper under the Residency Affiliation Agreement are as follows:

> 2.1 Cooper shall appoint a program director with full authority to direct, administer and coordinate the emergency medicine residency program activities at Cooper and Memorial.
>
> 2.2 Cooper shall be responsible for reviewing the qualifications of each of its residents rotating at Memorial prior to participating in the Program to ensure that the resident is fully qualified to assume and carry out the requirements of the Program.
>
> 2.3 Cooper shall, upon request of Memorial, immediately remove any resident participating in the Program who at any time fails to comply with the Residency Agreement, subject to the provisions of the Due Process Procedure specified in the Residency Agreement.
>
> Cooper shall, upon request of Memorial, immediately remove from Memorial any resident whose continued presence in the program at Memorial has been determined by Memorial not to be in its best interests, Memorial shall discuss any such determination with Cooper before making the request for removal. Memorial understands that when a resident is removed from Memorial by Cooper pursuant to this Section, Cooper may not be able to replace that resident.
>
> 2.6 Cooper shall be responsible for all compensation to be paid to the residents and for providing benefits specified in the Residency Agreement.

Grand Cert. at Exhibit D.

The record does not contain a written agreement between Perlman and

Virtua. There is, however, a "Resident Agreement" between Perlman and Cooper that reflects the terms of Perlman's residency with Cooper regarding duration, pay and benefits, liability insurance, vacation, uniforms, and meals. But as to the requirements of her rotation at Virtua Memorial, Perlman deposed that she had an understanding of what was expected of her and generally understood, from speaking with former residents, how the program operated. Though she does not remember if she received a policy and procedures manual relevant to Virtua Memorial, when asked whether anyone explained to her what her responsibilities and duties were going to be, Perlman deposed, "I can't remember exactly how it was described, but they kind of tell you what your rotation is going to be and what you are expected to do out there. When you get out there, Dr. Escalona fills you in on whose office hours you are going to go to, kind of how they do things at that hospital and what they would like your role to be." (Perlman Dep. at 519:10-24). One requirement of her residency, at least as Perlman understood it, was to apply for staff privileges. Perlman duly applied for and was granted these privileges. Essentially, one who has staff privileges is permitted to perform certain procedures that one who does not have staff privileges cannot perform, such as inserting a chest tube and intubation,

   During her residency, Perlman treated only patients of Virtua Memorial under the direction of senior Cooper residents and Virtua Memorial doctors. From Perlman's perspective, her supervisor was Dr. Escalona of Virtua Memorial. But there is

5

evidence that senior Cooper residents still dictated, to an extent, the patients Perlman could treat.  Specifically, as explained by Dr. Thomas Whalen of Cooper, fourth-year residents from Cooper would provide significant input on the types of cases a resident such as Perlman would work on.  The goal, according to Whalen, was to maximize teaching impact by choosing appropriate assignments from the array of procedures that were to be performed on a given day.   Thus, Perlman's residency appears to have been directed by Cooper residents and Virtua Memorial doctors.

## II.  SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In deciding whether there is a disputed issue of material fact, a court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party.  Id. at 250; Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of persuasion at trial, however, "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  The non-moving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material of fact.  FED. R. CIV. P. 56(e); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (citation omitted).  "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 322).

### III. DISCUSSION

Because a jury could conclude that Perlman was not an employee of Virtua Memorial, the Court will deny Defendants' motion for summary judgment.

Five factors are relevant in determining whether there is a special employer-employee relationship under New Jersey's Workmen's Compensation Act:

> (1) the employee has made a contract of hire, express or implied, with the special employer;
> (2) the work being done by the employee is essentially that of the special employer;

7

>  (3) the special employer has the right to control the details of the work;
>  (4) the special employer pays the employee's wages; and
>  (5) the special employer has the power to hire, discharge or recall the employee.

Kelly v. Geriatric and Medical Services, Inc., 671 A.2d 631, 633 (N.J. Super. App. Div. 1996).

Whether Perlman is an employee under this analysis is significant on two levels. First, if Perlman is properly considered an employee of Virtua Memorial, then her exclusive remedy is found under the workmen's compensation laws, not in tort. Id. at 634. Second, if Perlman is limited to workmen's compensation recovery from Virtua Memorial, then she is barred from recovering in tort from fellow Virtua Memorial employees Baker and Forrest. Volb v. G.E. Capital Corp., 651 A.2d 1002, 1005 (N.J. 1995). Because this issue is before the Court on Defendants' motion for summary judgment, the Court will apply this five-factor test by construing the record, and the reasonable inferences to be drawn from it, in a light most favorable to Perlman. For "[t]he question whether an employment relationship exists is reserved for the trier of fact where there is a conflict in the evidence or the inferences to be drawn from it." Kelly, 671 A.2d at 636 (citing Brill v. Guardian Life Ins. Co., 666 A.2d 146, 156-57 (N.J. 1995)).

Turning to the first factor, contrary to what Defendants characterize as a clear express and implied contractual relationship, it is doubtful that a contractual relationship existed between Perlman and Virtua. At the very least, it is a jury question.

8

Defendants point out that Perlman subjected herself to the rules and regulations in place at Virtua Memorial and also to the supervision of Virtua Memorial doctors. Defendants also rely heavily on Perlman's application for staff privileges to demonstrate a contractual relationship, arguing that such privileges were a condition of her working at Virtua Memorial. There is no doubt that Perlman assented to the supervision and control of Virtua Memorial staff. Further, as a result of working at Virtua Memorial, Perlman received the valuable educational experience of working with patients.

As one New Jersey court has explained, subjugation to the rules and supervision of the putative special employer, though relevant, may evidence no more than continued loyalty to one's original employer. See Murin v. Frapaul Constr. Co., 573 A.2d 989, 993 (N.J. Super. App. Div. 1990) ("Although consent to a new contract with a special employer may be implied from the employee's acceptance of the special employer's control and direction, such acceptance may actually be a continuance of obedience to the general employer's commands."). In other words, that Perlman subjected herself to the rules and supervision imposed by Virtua Memorial may merely constitute evidence of her intention to honor her contract with Cooper. Thus, based on the evidence pointed to by Defendants, a jury plausibly could find no new contractual relationship was formed between Perlman and Virtua Memorial.

The second factor is clearly in Defendants' favor. Perlman was obviously treating Virtua Memorial patients as an agent of Virtua Memorial. Perlman points to the

9

underlying purpose of the Residency Affiliation Agreement–to provide Cooper staff and facilities with which to train residents–as evidence that Virtua Memorial was merely a conduit through which Perlman did Cooper's work.  Whatever the purpose of the agreement, it does not change that Perlman treated Virtua Memorial patients–the primary activity of any hospital.

The third factor could properly be resolved in favor of either Perlman or Defendants.  Under the right to control factor, the focus is on the right to control, as opposed to the actual exercise of control.  See Kelly, 671 A.2d at 635.  There is evidence in the record that Perlman was under the supervision of Virtua Memorial doctors–specifically Pasqual and Escalona.  Further, sections 1.2 and 1.3 of the Residency Affiliation Agreement (reproduced above) show that Virtua Memorial was responsible for supervision and control of the Cooper residents with regard to the residents' relationships with patients and doctors and that Memorial was responsible for compiling an appropriate teaching staff for the residents.  But senior residents from Cooper dictated which patients the junior residents, such as Perlman, would be assigned to in the hope of providing an educationally enriching experience.  In weighing this evidence, a jury will need to determine which entity–Virtua Memorial or Cooper–had the right to control the details of Perlman's work.  Given that there is evidence that the right to control Perlman's work was shared between Virtua and Cooper, the Court cannot decide this factor as a matter of law.

The fourth factor–which company paid the employee's wages–resolves in favor of Perlman. Defendants claim that Attachment B of the Residency Affiliation Agreement shows that Virtua Memorial paid Perlman's wages by reimbursing Cooper. The parties agree that Cooper issued a paycheck to Perlman. It is also undisputed that the Residency Affiliation Agreement obligates Cooper to be responsible for Perlman's compensation and benefits. The only reimbursement referred to in the Agreement is listed in Attachment B. As the Court explained above, the relevance of Attachment B is questionable in light of its vague reference to PGY-3 and its general lack of a logical connection to Perlman. Further, Attachment B reflects a reimbursement schedule for the period beginning July 1, 1997 and ending June 30, 1998. Perlman's two-month rotation at Virtua Memorial occurred during the year 2000, as part of her 1999-2000 residency agreement with Cooper. This difference in date ranges casts further doubt on the relevance of Attachment B to the current motion for summary judgment. Inasmuch as this is the only evidence referred to by Defendants, they have failed to make a showing sufficient to resolve this factor in their favor.

The final factor, which focuses on the ability to hire and fire, can be decided in Perlman's favor. Virtua Memorial had no power over the hiring and selection of residents for rotations at Virtua Memorial. That power lay solely with Cooper. There is no doubt that Virtua Memorial had the right to request that Cooper remove Perlman from Virtua Memorial. But that right does not translate into a right to fire Perlman.

Rather, Virtua Memorial merely had the contractual right to demand that Cooper remove Perlman. Beyond that, Virtua Memorial was powerless. If the situation arose that Virtua Memorial wanted Perlman removed from her rotation, it could not act unilaterally. Rather, it had to request that Cooper remove Perlman. Presumably, Cooper would abide by Virtua Memorial's request. But if Cooper refused to remove Perlman, Virtua's dispute would be with Cooper, in contract. Under no circumstances, however–at least by the terms of the Residency Affiliation Agreement–could Virtua Memorial simply dismiss Perlman. Although at least one court has found a similar situation to be the "functional equivalent of the power to discharge," see Kelly, 671 A.2d at 636, the jury must decide this question. Id.

In sum, viewing the evidence and all reasonable inferences in Perlman's favor, the Court concludes that a jury could find Perlman was not an employee of Virtua Memorial for purposes of the New Jersey Workmen's Compensation Act. Accordingly, the Court will deny Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons stated above, the Court will deny Defendants' motion for summary judgment. Additionally, the Court notes that Defendants Arbittier and Boyce filed a motion for summary judgment on the same grounds as Virtua Health, Virtua Memorial, Baker, and Forrest. Having already entered judgment in favor of Arbittier and

Boyce and against Perlman with the Order of December 17, 2004 (docket entry # 293), the Court dismissed the new motion for summary judgment, which was also directed at Perlman's claims against them.  Unsatisfied, Arbittier and Boyce moved the Court to reconsider its dismissal of the motion for summary judgment.  Why these Defendants insist on continuing to litigate a case in which they have gained judgment against the Plaintiff is beyond comprehension.  In any event, the Court will not reconsider its Order dismissing the motion for summary judgment filed by Arbittier and Boyce.  An Order will follow.


Dated: 5-26-05__

s/Robert B. Kugler_____
ROBERT B. KUGLER
United States District Judge